UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>v. )<br>KARI KELLEY )<br>)<br>Defendant. )<br>_____) | No.   21-cr-201 (DLF) |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

Kari Kelley, by her attorney, Maria N. Jacob, hereby submits the following memorandum in aid of sentencing in this matter.

Ms. Kelley is a 41 year old dedicated single mother who has overcome significant obstacles in her life. She is among the least culpable group of defendants who walked into the Capitol building, had no confrontation with law enforcement, and walked out with no incident after approximately 10 minutes of walking around in non-sensitive areas. Most notably, she entered the building about an hour after the Capitol had initially been breached and she had no idea about the chaos that had transpired until later that night when she watched the news. Ms. Kelley has sincerely accepted responsibility for her conduct and respectfully requests that the Court impose a sentence of 12 months' probation.

1

## BACKGROUND

Ms. Kelley entered a guilty plea to one count of Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 USC §5104(e)(2)(G), for her participation in the events on January 6, 2021.  On that day, she attended the "Save America" rally where she listened to several speeches encouraging the crowd to march to the Capitol to "stand up for this country and stand up for what is right.[1]" After the rally, Ms. Kelley, along with thousands of other individuals attending the rally, walked over to the Capitol building and entered inside.  Ms. Kelley did not participate in any violence, destruction or theft of property, and did not have any negative confrontations with law enforcement while entering or exiting the building.[2]  Ms. Kelley will appear for sentencing on March 17, 2022.  She has reviewed the Pre-Sentence Investigation Report and does not have any further objections to its contents.

---

[1] *See* Matthew Choi, *Trump is on trial for inciting an insurrection. What about the 12 people who spoke before him?*, Politico (Feb. 10, 2021), available at https://www.politico.com/news/2021/02/10/trump-impeachement-stop-the-steal-speakers-467554.

[2] The government in its sentencing memorandum has suggested that lack of violence and destruction of property is not a mitigating factor in misdemeanor cases because, had this conduct been present, they would be charged with felony offenses. *See* Gov't Sent. Memo at 15.  However, this distinction is important because there have been misdemeanor cases where defendants did display assaultive and/or aggressive behavior. *See United States v. Bradley Rukstales*, 21-CR-041 (CJN) (defendant sentenced to 30 days' incarceration after government alleged he threw a chair in the direction of police officers who had been forced to retreat and was ultimately dragged out of building after resisting their efforts); *United States v. Jacob Wiedrich*, 21-CR-581 (TFH) (two months' home detention imposed as defendant was young, did well on pre-trial supervision, and had no criminal history but shouted at police while entering building); *United States v. Jordan Stotts*, 21-CR-272 (TJK) (court imposed two months' home detention despite Stotts shouting at police and scaling wall to gain access to Capitol).

## ARGUMENT

### I.   Legal Standard

The Court is well aware that the Supreme Court's opinions in *Kimbrough v. United* States, 552 U.S. 84 (2007), and *Gall v. United States*, 552 U.S. 38 (2007), have dramatically altered the law of federal sentencing.  Congress has required federal courts to impose the least amount of imprisonment necessary to accomplish the purposes of sentencing as set forth in 18 U.S.C. §3553(a).  Those factors include (a) the nature and circumstances of the offense and history and characteristics of the defendant; (b) the kinds of sentences available; (c) the advisory guideline range; (d) the need to avoid unwanted sentencing disparities; (e) the need for restitution; and (f) the need for the sentence to reflect the following: the seriousness of the offense, promotion of respect for the law and just punishment for the offense, provision of adequate deterrence, protection of the public from future crimes and providing the defendant with needed educational and vocational training, medical care, or other correctional treatment.  *See* 18 U.S.C. §3553(a).

### II.   Imposing a Sentence of Twelve Months' Probation is Sufficient, But Not Greater Than Necessary, to Comply with 18.U.S.C. §3553(a).

#### a. Ms. Kelley's Personal History and Characteristics

Ms. Kelley was born in Springfield, Missouri and grew up in a very small town called Fair Grove, Missouri, where she resided until she was 18 years old. Her parents divorced when she was only three years old and she was raised mostly by her father after her mother abandoned the family mostly due to her struggle with

3

alcoholism. Ms. Kelley got along with her step-mother after her father re-married and has a better relationship with her than her biological mother.

Ms. Kelley graduated high school in Missouri and then moved to Mississippi to pursue higher education, where she eventually earned an associate's degree and began pursuing a bachelor's degree at the University of Southern Mississippi. When Hurricane Katrina hit in 2005, she was forced to leave college when she was just shy of 16 credits from earning her degree.

Ms. Kelley settled in Mobile, Alabama where she currently resides.  She found stable work as an inside desk adjuster for Pilot Catastrophe and remained in that position until 2018.  In 2009, Ms. Kelley met her son's father, who she maintained a common law relationship with for approximately four years.  They had a son together, who is now 11 years old and who resides with Ms. Kelley. Although Ms. Kelley and her son's father are separated, he still maintains a good relationship with her son, however Ms. Kelley is the primary caregiver.

Ms. Kelley always maintained employment and provided a stable situation for her son, who is excelling in his academics.  She has overcome several struggles so that she can be a good mother to her son.  First, in 2019, her father passed away. This loss devastated Ms. Kelley and she has felt lost ever since.  He was the one that raised her and helped her care for her son.  She relied on him and lost a huge part of herself when he died.  After learning of his passing, Ms. Kelley quit her job because she could not handle the stress of work, raising a child alone, and the devastation she felt from his loss.  She went to Missouri to take care of her father's

4

complicated affairs and to regain her sanity. Then, not even a year later, she was diagnosed with cervical cancer and endometriosis and had to have two surgeries, one being an emergency surgery after complications from the first surgery led to massive blood loss. She has had countless doctor's appointments and has a lowered immune system due to her medical conditions, which often causes a simple cold to persist for longer than usual.

Managing the past few years has been a challenge for Ms. Kelley as she has been under a large amount of stress. Also shortly after her father's passing, she got in trouble for the first time in her entire life. After going to a Mardi Gras parade out of state and having two drinks, she was arrested after being pulled over by law enforcement and testing above the legal limit on a breath test. She was placed in a deferred disposition program where she was ultimately found to be unsuccessful after testing positive for an illicit substance. Ms. Kelley was not in good mental health at the time and she had never tried illegal drugs until she was at a gathering and felt hopeless about her situation. After she was convicted and spent 5 days in jail, she instantly snapped out of her aimlessness and has been motivated ever since to succeed and continue providing for her son. Her drug use was during an isolated time period and this behavior will never happen again.[3] Since that drug use, she has not only been compliant with her current conditions of release, but she has also

---

[3] In the government's and probation's recommendation to the Court, it states that Ms. Kelley did not disclose her use of an illicit substance in the pre-sentence interview. However, counsel advised her not to discuss her prior offense (which involved the use of an illicit substance), which is why Ms. Kelley did not disclose that fact. It was not an attempt on her part to hide anything or to be dishonest.

been compliant with her testing requirements and obligations from her Alabama supervision which is set to expire this September.  *See* ECF Nos. 70, 73.

### b. Nature and Circumstances of the Offense

Ms. Kelley went to the Capitol Building with two other individuals after being told that there would be a peaceful protest there after the rally.[4]  The former President told his supporters that they would go down to the Capitol *together* as he said, "we're going to walk down to the Capitol."[5] So, Ms. Kelley followed the enormous crowd down to the Capitol after the speeches were done.  She entered the Capitol building at approximately 2:56 P.M., long after the building was initially breached, and long after Congress had been evacuated.  Ms. Kelley did not see any of the violence that had occurred earlier in the afternoon.  However, she acknowledges now that her behavior was inappropriate and that she knew she should not have entered a building when there were signs around that it was not permissible to enter.

The government provided a clip of a video that shows Ms. Kelley waive her hands and say, "come on," to the male individuals she came with in order to argue

---

[4] For an hour, President Trump encouraged his supporters to "fight" for him.  He said, "We will not let them silence your voices…*we're* going to walk down to the Capitol, and *we're* going to cheer on our brave senators and congressman and women, and we're probably not going to be cheering so much for some of them…[if the election is certified], you will have an illegitimate president.  That's what you'll have.  And *we* can't let that happen…And *we* fight.  *We* fight like hell.  And if you don't fight like hell, you're not going to have a country anymore." *See* Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.

[5] *Id.*

6

that she "encouraged" her friends to enter the Capitol building. *See* Gov't Sent. Memo at 5. However, that clip does not encompass the entire series of events that day to put that action into context. Ms. Kelley explained in her interview with law enforcement that she had been separated from her friends and was trying to find them for a while. When she finally found them outside of the Capitol building, she wanted to remain together because she did not want to get lost from them again. That is why she signaled to them to let them know where she was. It was not an attempt to "encourage" them to violate the law.

While inside the building for a little over 10 minutes, Ms. Kelley did not have any confrontation with law enforcement, did not destroy any property, and had no idea what had transpired just an hour before he arrived. She left the building voluntarily and returned home to Alabama shortly thereafter.

Ms. Kelley is truly remorseful for her conduct. She accepted responsibility and has distanced herself completely from the events on January 6, 2021. She submitted a letter to the Court where she explains:

> There is not a day that goes by that I look at myself in the mirror and not embarrassed by what I see…I pray that grace be given when deciding the sentence that I should receive as I have been punishing myself for not making the right choices and being the person that I know my dad would've expected me to be.

*See* Exhibit 1, Letter from Kari Kelley.

The government relies on a summary of a law enforcement interview with Ms. Kelley to argue she was untruthful about her intentions of going in the building and that is a show of lack of remorse. *See* Gov't Sent. Memo at

7

12. Firstly, this was a voluntary interview given after Ms. Kelley was arrested for the instant offense. She had an absolute right against self-incrimination but because she wanted to accept responsibility for her actions, she waived that right and agreed to speak with the F.B.I. She then admitted illegal conduct to them by telling them she was entered the building. Secondly, a summary of an interview is far different than a recording and so there is no way to understand the whole context of the conversation.[6] Ms. Kelley explains that she wanted to stay together with them the whole day but that was not the motivation for going into the building. There could have been a misunderstanding or a lack of context to the conversation she had with the F.B.I. In no way does this mean she is not remorseful for her actions.

### c. The Need to Promote Respect for the Law, Provide Just Punishment, Protect the Community and Provide Adequate Deterrence, and the Need to Avoid Unwanted Sentencing Disparities

The request for twelve months' probation acknowledges the need to promote respect for the law and provide just punishment. Ms. Kelley concurs with the recommendation of United States Probation that "a probationary sentence would serve to protect the community and fulfill the goals of deterrence and punishment". *See* ECF No. 93.

---

[6] Undersigned counsel has not been provided a recording and is unsure as to whether the interview was recorded or not.

Furthermore, a sentence of 12 months' probation is in line with similar past sentences imposed. For example, in *United States v. Danielle Doyle*, 1:21-CR-324 (TNM), the court imposed a sentence of 2 months' probation. Like Ms. Kelley, the defendant in that case was not in the building for very long and left with no incident. Lastly, this case is also similar to *United States v. Eliel Rosa*, 1:21-CR-068 (TNM) where the court imposed a sentence of 12 months' probation. In that case, the defendant accepted responsibility early on, did not pre-plan or coordinate his activities, did not go far into the Capitol building, and left when asked to do so by law enforcement.[7]

This case can be distinguished from those who received lengthier periods of probation. For example, the Court in *U.S. v. Jonathan Sanders*, 1-21-CR-384 (CJN), the Court imposed 36 months' probation for a defendant who had no criminal history, however showed a true lack of remorse to the FBI during a recorded interview, saying "he did nothing illegal," and believed he did nothing wrong. In that case, the government recommended that the defendant serve two of those months on home detention, however the court imposed 60 hours of community service instead.[8] Furthermore, in *United States v. Jackson Kostolsky*, 21-cr-197 (DLF), the Court imposed a sentence of 36 months' probation with 1 month' home

---

[7] *See also U.S. v. Jennifer Parks*, 1:21-CR-363 (CJN) (sentenced to 24 months' probation); *United States v. Julia Sizer*, 1-21-CR-621 (CRC) (sentenced to 12 months' probation); *United States v. Gary Edwards*, 1:21-CR-366 (JEB) (sentenced to 12 months' probation); *U.S. v. Jordan Stotts*, 21-CR-272 (TJK), (sentenced to 24 months' probation).
[8] The government's recommendation in *Sanders* also shows the government's inconsistent sentencing recommendations as it now argues that 30 days of jail time is appropriate for Ms. Kelley, despite the fact that she is less culpable than defendants like Sanders.

detention. The defendant in that case was also not in the Capitol building for very long, exited the building when told to do so and met with the FBI admitting to his conduct.[9] In the instant case, Ms. Kelley has served more than a year of supervision already and has been remorseful from day one.

Lastly, general deterrence has also been served as the whole world has already observed the collateral consequences that have damaged the lives and reputations of misdemeanants with the same charge. The advancement of technology and the rise of social media has made available the intimate details of every January 6 defendants' case with the touch of a button. The world is watching and has observed even the least culpable defendants be arrested, charged, and sentenced in public. Given the global pandemic and the need to conduct hearings via video conference, the world can actually listen to what happens to defendants on a public call in line. There is no doubt that general deterrence has been served, especially in these cases where the public knows every detail and understands exactly what would happen to them if this behavior is ever repeated.

### I. A Sentence of Probation and Incarceration For a Petty Offense is Not Permitted

In its sentencing memorandum submitted to the Court, without any prior notice to the defendant in her plea agreement, the government now claims that Ms. Kelley can be sentenced to a period of incarceration followed by a period of probation. *See* Gov't Sent. Memo, ECF No. 97. Contrary to the government's

---

[9] It appears as though the aggravating factor that led to a condition of one month' home detention was post January 6 statements he made about his participation.

assertion, the Court is not authorized to impose both a sentence of incarceration and a sentence of probation in this case, and doing so would raise significant constitutional concerns. 18 U.S.C. § 3551; *see United States v. Torrens*, No. 21-cr-204 (BAH), ECF No. 110 & 125 (Chief Judge Howell chose to not impose such a sentence after briefing provided to the Court). The plea agreement nowhere indicates or notifies Ms. Kelley that she may be subject to both 6 months of incarceration and 5 years of probation. A correct reading of the relevant statutes and the legislative history, as discussed in the defense pleadings in *Torrens*, make it clear that a district court has a dichotomous choice: it can either sentence the defendant to imprisonment up to six months, or it can sentence the defendant to probation for up to five years. Where, as here, there is solely one single petty offense, the statute precludes a combined probationary and a sentence of incarceration.

The only prior authority that is applicable, *United States v. Posley*, 351 F. App'x 801, 809 (4th Cir. 2009) (unpublished), misreads 18 U.S.C. § 3563(a)(3) and ignores 18 U.S.C. § 3551(b).[10] The Office of the Federal Public Defender recently filed an Amicus brief in *U.S. v. Caplinger*, 21-CR-(PLF) that addresses these arguments in further detail. *See* ECF No. 53 attached as Exhibit 2. Ms. Kelley adopts the same arguments made in *Caplinger* and requests that the Court reject

---

[10] It appears that the decision has not been cited by any court, according to a Lexis citing history search. Its analysis, issued on the papers without the benefit of oral argument, id. at 809, is inaccurate and not remotely persuasive for the reasons set forth in the pleadings in *Torrens*.

11

the government's proposition that a petty offense can include a sentence of incarceration followed by a period of supervision.

The government may also try to argue that at a minimum, intermittent time as a condition of probation is permissible. However, it is not permissible as it is unclear at what point an "interval of time" effectively becomes a "term of imprisonment" and therefore would constitute an unauthorized sentence of both imprisonment and probation. Cf. 18 U.S.C. §3583(d) (term of intermittent confinement pursuant to §3563(b)(10) may be imposed only for a *violation* of condition of supervised release). A sentence of "intermittent confinement" as a condition of probation for a petty offense raises significant issues and potential constitutional issues. *See United States v. Voda*, 994 F.2d 149, 151 n.2 (5th Cir. 1993) ("Voda expressly waived any argument that imposition of sixty days' confinement served over sixty day period is "imprisonment," as opposed to intermittent confinement, and thus a violation of section 3562"); *United States v. Baca*, 2011 WL 1045104 (C.D. Cal. March 18, 2011) supra at *2 (45 day condition of confinement violates statute).

## **CONCLUSION**

For the reasons stated above, Ms. Kelley respectfully requests that the Court impose 12 months' probation. Ms. Kelley also requests that a fine not be imposed in light of her obligation to pay $500 restitution.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Maria N. Jacob
Assistant Federal Public Defender
625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004
(202) 208-7500
Maria_jacob@fd.org