```
 1                BEFORE THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA,         .
                                       .  Case Number 21-cr-201
 4             Plaintiff,              .
                                       .
 5        vs.                          .
                                       .
 6   ZACHARY HAYES MARTIN,             .
     MICHAEL AARON QUICK,              .
 7   STEPHEN BRIAN QUICK,              .
     KARI KELLEY,                      .  March 17, 2022
 8                                     .  11:09 a.m.
               Defendants.             .
 9   - - - - - - - - - - - - - - - - - .

10                 TRANSCRIPT OF SENTENCING HEARING
                 BEFORE THE HONORABLE DABNEY L. FRIEDRICH
11                   UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   For the United States:       JACK KORBA, AUSA
                                  United States Attorney's Office
14                                601 D Street Northwest
                                  Washington, D.C. 20579
15
     For Defendants Martin,
16   M. Quick, and S. Quick:      JOSEPH PASSANISE, ESQ.
                                  Wampler & Passanise
17                                2974 East Battlefield Road
                                  Springfield, Missouri 65804
18
     For Defendant Kelley:        MARIA JACOB, AFPD
19                                Federal Public Defender's Office
                                  625 Indiana Avenue Northwest
20                                Washington, D.C. 20004

21   Official Court Reporter:     SARA A. WICK, RPR, CRR
                                  United States District Court
22                                  for the District of Columbia
                                  333 Constitution Avenue Northwest
23                                Room 4704-B
                                  Washington, D.C. 20001
24                                202-354-3284

25   Proceedings recorded by stenotype shorthand.
     Transcript produced by computer-aided transcription.
```

```
 1                         P R O C E E D I N G S

 2            (All participants present via video conference.)

 3             COURTROOM DEPUTY:  Your Honor, we are in Criminal

 4    Action 21-201, the United States of America versus Zachary

 5    Martin, Michael Quick, Stephen Quick, and Kari Kelley.

 6        If I can have the parties identify themselves for the

 7    record, beginning with the United States.

 8             MR. KORBA:  Good morning, Your Honor.  Jack Korba on

 9    behalf of the United States, standing in for AUSA Brenda

10    Johnson.

11             THE COURT:  Good morning, Mr. Korba.

12             MS. JACOB:  Good morning, Your Honor.  Maria Jacob

13    appearing on behalf of Ms. Kelley, who is present via video.

14             THE COURT:  Good morning to you both.

15             MR. PASSANISE:  Joseph Passanise, counsel for Zach

16    Martin and Stephen and Michael Quick.

17             THE COURT:  All right.  Good morning, all.  You are

18    all there in the same room?

19             MR. PASSANISE:  We are, Your Honor.

20             THE COURT:  And I see we have a probation officer on

21    the line as well?

22             PROBATION OFFICER:  Yes, Your Honor.  Good morning.

23    Aidee Gavito as to all defendants in this case for Probation.

24             THE COURT:  Thank you, all.

25        So this is -- the pleas in this case were to a petty
```

offense, a class B misdemeanor.  So I don't need to make a CARES

Act finding in order to do the sentencing by video.  Even so, I

do want to make sure with respect to each defendant that they do

want to appear by video conference rather than wait to do the

sentencing in person in the courtroom.

So let me start with -- I think the first defendant in this

case is Mr. Martin.  Is it your desire to appear for sentencing

by video rather than do this in the future in the courtroom?

DEFENDANT MARTIN:  Yes, Your Honor.

THE COURT:  All right.  You understand you have the

right to be sentenced in the courtroom?

DEFENDANT MARTIN:  Yes, I do.

THE COURT:  All right.  How about Michael Quick?  Do

you also understand that?

DEFENDANT M. QUICK:  Yes, Your Honor.

THE COURT:  And Stephen Quick?

DEFENDANT S. QUICK:  Yes, Your Honor.

THE COURT:  And Ms. Kelley?

DEFENDANT KELLEY:  Yes, Your Honor.

THE COURT:  Okay.  I'm also going to ask all four

defendants in order again whether you've had adequate time to

review the presentence reports and recommendations in this case

and had an opportunity to correct any errors in the report,

along with your attorney.

Mr. Martin, is that the case?  You have had a chance to

1    review the PSR and recommendation and make any objections?

2               DEFENDANT MARTIN:  Yes, I have, Your Honor.

3               THE COURT:  All right.  Mr. Michael Quick?

4               DEFENDANT M. QUICK:  Yes, I have, Your Honor.

5               THE COURT:  All right.  Stephen Quick?

6               DEFENDANT S. QUICK:  Yes, Your Honor.

7               THE COURT:  And Ms. Kelley?

8               DEFENDANT KELLEY:  Yes, Your Honor.

9               THE COURT:  Sorry, Ms. Kelley.  I didn't hear you.

10               DEFENDANT KELLEY:  Yes, Your Honor.

11               THE COURT:  All right.  And then I will ask

12    Mr. Passanise, if you can just confirm, I know there are some

13    unresolved objections we will address in just a minute.  But

14    aside from those that are noted in the addendums to the

15    presentence report, are there any remaining factual inaccuracies

16    or objections that the Court needs to address, Mr. Passanise?

17               MR. PASSANISE:  No, Your Honor.

18               THE COURT:  Okay.  And Ms. Jacob?

19               MS. JACOB:  No, Your Honor.

20               THE COURT:  Okay.  Let me just go through for

21    Mr. Martin and Mr. Quick, both Quicks, the PSRs, I see there are

22    some unresolved objections.

23       Before I do that, Ms. Jacob, let me just confirm with you,

24    there are none for Ms. Kelley; correct?

25               MS. JACOB:  Correct, Your Honor.

1          THE COURT:  Okay.  Mr. Passanise -- sorry.  I'm going

2     to say your name incorrectly probably all day -- with respect to

3     Mr. Martin, the first objection that you raised has been

4     resolved by Probation.  There's this objection that you have

5     made for all three defendants with regard to the information

6     that I believe relates to the January 6 events as a whole, is

7     that correct, the offense conduct listed in paragraphs 14 to 20

8     of the PSR?  That's what you're objecting to?

9          MR. PASSANISE:  Yes, Your Honor.  I will waive the

10    purpose of my objections.  I was -- my context was that I

11    understand that the government was bringing those paragraphs in

12    to set the stage for the background, while that behavior was not

13    directly related to my three clients.  So I will waive the

14    objection, and we can address anything in allocution.

15         THE COURT:  All right.  And I was inclined to overrule

16    the objection anyway.  I'm not relying on that to sentence these

17    defendants.  It just provides helpful context.  Obviously, they

18    were a part of a large mob, and to that extent, I think it's

19    relevant and necessary context.  But I'm not, and nor do I think

20    the government is attempting to hold them accountable for

21    assault and property damage of others other than to say they

22    were a part of a large mob that made the officers' jobs more

23    difficult that day.

24         With respect to Mister -- it's hard to keep all these PSRs

25    correct.  Let me start with Michael Quick.  So you had the same

1    objection which you're withdrawing here, but then you also have

2    this objection with regard to Michael Quick, paragraph 64.

3        And I'm just wondering, for the probation officer, why not

4    include this additional job information if this is, in fact,

5    true?  I guess if you say that he's been employed, but it

6    appears that there's an additional job he's done.  Is there any

7    objection from Probation's standpoint to include this

8    information, or is there a question as to whether it's accurate?

9            PROBATION OFFICER:  There is no objection, Your Honor.

10   We -- yeah.

11           THE COURT:  Okay.  Unless you have reason to think

12   it's not true, I think it's appropriate to add that.

13           PROBATION OFFICER:  Yes, Your Honor.  We can make --

14           THE COURT:  Okay.  You can make that --

15           PROBATION OFFICER:  We can make that --

16           THE COURT:  Okay.  And then with regard to paragraph

17   68, Mr. Passanise, is this an issue really?  It's pretty --

18           MR. PASSANISE:  No, Your Honor.  I was just trying to

19   give accurate information to Probation.

20           THE COURT:  All right.  That one to me did not seem to

21   be that material, but if you think otherwise, let me know.

22           MR. PASSANISE:  Yes, Your Honor.

23           THE COURT:  With regard to Stephen Quick, however,

24   there is this objection to the criminal history which I want to

25   make sure I understand.  Is your objection that this incident

1    never occurred or that he was never charged?

2              MR. PASSANISE:  Never charged, Your Honor.

3              THE COURT:  All right.  Well, I'm -- if he's not

4    objecting to the incident and suggesting this is a different

5    Stephen Quick, I'm inclined to credit what's in here.  The

6    records do reflect that he was charged.  If I'm remembering

7    correctly, he wasn't convicted but just charged; is that right?

8              MR. PASSANISE:  He had a friend that was charged with

9    it, Your Honor.  He wasn't charged with it.  But I understand --

10   I think in the scheme of things, it was just trying to put

11   context to it.

12             THE COURT:  Well, again, if you're telling me that he

13   didn't -- this incident never occurred, then I would be inclined

14   to strike it from the report, but if it did occur -- at least

15   according to the sheriff's office records, there is some

16   indication that he was released and ordered to pay a fine.

17   Given that that's the official records, I'm inclined to leave it

18   in here.  Of course, the guidelines don't apply here, but it is,

19   I think, relevant to his criminal history.  So I'm not going to

20   ask Probation to remove that.

21        All right.  Have we covered everything in terms of the PSRs

22   such that counsel for any defendant has no objection to me

23   accepting the presentence reports as my findings of fact under

24   Rule 32?  Mr. Passanise?

25             MR. PASSANISE:  Correct.

1          THE COURT:  I'm sorry?

2          MR. PASSANISE:  That's correct, Your Honor, yes.

3          THE COURT:  Okay.  I don't know why, sometimes the

4     microphone's not quite picking you up sometimes.

5          And Ms. Jacob?

6          MS. JACOB:  Yes, Your Honor.

7          THE COURT:  All right.  So again, I will accept the

8     PSRs as my findings of fact under Rule 32.

9          Under 1B1.9 of the guidelines, the guidelines don't apply

10    because it's a petty offense.  So I will apply the 3553(a)

11    factors in deciding the appropriate sentence.

12         Let me start with Mr. Korba.  Mr. Korba, I know that you're

13    standing in for the AUSA here.  So I appreciate that you may not

14    be as intimately familiar with this case as she might have been,

15    but you can see, she filed lengthy sentencing memoranda in this

16    case.  I don't know to what extent you're familiar -- I don't

17    think I've had you in any of my cases, but you're familiar with

18    the sentences I've imposed in similar cases.

19         But I certainly appreciate that the government is trying

20    hard to be consistent in these cases and making consistent

21    sentencing recommendations.  The judges, too, are trying to be

22    hard in -- I mean trying to do their best to impose consistent

23    sentences in like cases.

24         And if you've reviewed the sentences I've imposed in cases

25    like the instant one where there's no evidence of preplanning

that I'm aware of or the government's brought to my attention,

there's no evidence of any assault, any, for that matter,

encounters with law enforcement, any evidence of property

disruption, or really any aggravating factors that I see -- I

know there's some social media postings, and I know that a

couple of the defendants appeared to sort of minimize their

conduct a bit in interviews with law enforcement.  But as I read

those interviews, they did admit the offense, and whether they

went in the window or the door is not that material here, given

that they've basically accepted responsibility.  I'm not

inclined to view that as such an aggravating factor that I would

impose something other than a probationary sentence.

And just so the government understands where I'm coming

from -- I haven't had you, again, in these cases.  But I really

feel that for deterrence purposes and rehabilitation purposes, a

sentence of -- that imposes a period of supervision by the Court

is more important than a very short amount of time in prison.

And I do -- I've reviewed Judge Lamberth's opinion.  I

disagree with his reading of those statutes, and I've explained

it at length in other cases.  For now, I will just simply say

that I disagree with his reading of the language in this

relevant statute, the same or different offense language.  I

don't read it the same way he does.

And I do think that for Congress to abandon the basic rule

that applies in every other instance of the Court being able to

1    impose either probation or a sentence of imprisonment with

2    supervised release, I think it would have spoken more clearly.

3        So I disagree with his ruling, and I don't think I can do

4    both.  And given that I can't do both, I'm inclined to impose in

5    these sorts of cases where there are not aggravating

6    circumstances a sentence of probation.

7        So again, I recognize where the government's coming from.

8    I've just had enough of these cases now, probably ten or so,

9    where I've rejected calls for short terms of imprisonment and

10   instead imposed longer terms of probation because I think

11   supervision better furthers the goals of sentencing in these

12   cases where there are not aggravating factors.

13       Mr. Korba, I gave you all of that context so that you know

14   where I'm coming from.  And I've reviewed the government's

15   sentencing memorandum at length.  So not to totally preempt you,

16   but it's -- you've lost that battle in other cases.  So right

17   now, we're really looking at what are the appropriate conditions

18   for each of these defendants.

19       MR. KORBA:  Thank you, Your Honor, and I do appreciate

20   Your Honor realizing I'm standing in.  However, I have read and

21   digested all of the materials, as well as other cases in which

22   Your Honor, I believe, has sentenced similarly situated

23   defendants, as well as other judges.  So if Your Honor has any

24   particular questions, I'm more than happy to attempt to answer

25   them.

```
 1              THE COURT:  Okay.  Tell me, I saw that the government,
 2    you know, drew distinctions from -- with regard to the various
 3    defendants here.  And I know that some of that stems from
 4    conduct while on pretrial release, I would guess some of it from
 5    the minimization of conduct and statements to law enforcement.
 6        But help me understand how you're drawing these
 7    distinctions, and are they ones that really warrant either a
 8    longer term of probation for some defendants or, I think,
 9    greater conditions certainly with respect to some defendants.
10    So I'm interested in your perspective on that.
11              MR. KORBA:  Yes, Your Honor, I do have some points on
12    these particular defendants.  Does Your Honor have a preference
13    which defendant I start with?
14              THE COURT:  No, it doesn't matter.
15              MR. KORBA:  So I will start with defendant Kari
16    Kelley, Your Honor.
17        So I did read the defense sentencing memo as well, and I
18    think one of the aggravating factors the government would point
19    to in Ms. Kelley's situation is, number 1, she was the first of
20    her group to enter the Capitol through the broken window and in
21    the sentencing memo still does appear to try to minimize the
22    behavior enticing or encouraging her co-defendants to come into
23    the building with her.
24        Her explanation is just simply not plausible, in the
25    government's view, as she claims that she lost her co-defendants
```

1  in the masses and was trying to reunite with them.  Your Honor,

2  it just defies logic that someone would try to enter a broken

3  window in the U.S. Capitol, engage and enter the eye of the

4  storm essentially in order to try to reunite with your lost

5  group members.  A much more plausible explanation is to distance

6  yourself from that crowd and try to reunite with your companions

7  away from where the large crowd is.  So I just don't think that

8  explanation is reasonable and true, quite frankly.

9      And so just comparing that with the sentencing memorandum

10 filed on behalf of her co-defendants, that explanation is

11 inherently inconsistent with her co-defendants as well, who

12 indicate that their rendezvous point was supposed to be one of

13 the monuments, which clearly Ms. Kelley didn't go to, the

14 rendezvous point, according to the other co-defendants.  She

15 went to, like I said, the eye of the storm and tried to motion

16 her co-defendants in.

17     So I do believe that act of encouragement does sever her

18 apart from the other co-defendants in this particular situation

19 such that I understand Your Honor's ruling and view of Judge

20 Lamberth's opinion and Your Honor's restrictions here with

21 regard to sentencing, but I would argue that at least some

22 period of home confinement or home detention is warranted.

23     Your Honor, I would just point out as well, while the

24 defense does make a point and the government is sympathetic to

25 the defendant's health concerns that were outlined, however,

it's just frankly perplexing and worrisome that knowing she has a compromised health immune system she would enter a defined building with hoards of other people in close proximity.  It just, I think, speaks to the defendant's poor judgment as well.

And Your Honor, that is further exacerbated by, I think, what is already spelled out in the government's memorandum by the defendant testing positive for illicit substances while on pretrial release in this case, which is quite concerning to the government.

So I understand the defendant has offered a generic apology letter, but to set her apart from, for instance, her co-defendant Stephen Quick, the government doesn't see any true example of -- examples of true specific introspection about the day of that event, just really more of a generic apology, but still attempts to try to minimize her behavior and justify her actions in enticing her other co-defendants to enter.

So based upon those reasons, Your Honor, the government does believe that Ms. Kelley stands apart and should be sentenced to at least some period of home confinement.

THE COURT:  Okay.  Maybe it makes sense, Ms. Jacob, to have -- unless you have more to add, Mr. Korba, about Ms. Kelley, maybe it makes sense to hear from you, Ms. Jacob, in response to what Mr. Korba has said.

But anything aside from the evidence clearly showing Ms. Kelley entering the Capitol first, is there anything more

than that that distinguishes her in terms of the offense itself, the way in which it was completed?

I mean, she walked around like the other three; right?  She didn't do -- she didn't engage with law enforcement.  She didn't do any property damage.  She didn't prepare for the offense.

You have no evidence that she came to D.C. intending to go in the Capitol?

MR. KORBA:  That's correct, Your Honor.  The only factual evidence to distinguish them is the act of encouraging the other three to come into the building with her.

THE COURT:  Okay.  And in terms of conditions of probation, aside from the government thinking that the Court should impose a period of home detention or home confinement in terms of -- one condition I'm considering for several defendants is a mental health assessment and treatment, if necessary, in Ms. Kelley's case substance abuse treatment and testing.

I know the government has also suggested community service, which I think -- I think that was a part of your recommendation. Am I right about that?

MR. KORBA:  That's correct, Your Honor.

THE COURT:  I have imposed it in a number of cases. I'm always concerned, though, I want the priority to be a job and treatment where needed and don't ever want the community service to get in the way of those two things.  But that's your position, I should impose community service.

1     What about a fine with regard to Ms. Kelley?  It does seem

2    like she does not have the ability to pay a fine.

3         MR. KORBA:  I think given the fact that there's an

4    agreement on restitution, Your Honor, I don't think a fine is

5    necessary.

6     But I would agree with Your Honor about the substance abuse

7    assessment and treatment if deemed necessary.  I did read in the

8    latest filed pretrial report that I believe her probation in her

9    other matter is terminated.  So I think initial substance abuse

10   treatment in this case would be appropriate given the lack of

11   pretrial compliance.

12        THE COURT:  And Mr. Korba, I'm wondering whether you

13   agree with me, and I want to hear from Ms. Jacob, too, but it

14   does seem like Ms. Kelley had a really critical period in which

15   she was really struggling and appears from her performance in

16   the other case in Alabama that she successfully completed all of

17   that Court's requirements, which is a good sign, I think, for

18   her compliance on probation with this Court.

19     Do you disagree with that?

20        MR. KORBA:  No, Your Honor, I would agree with the

21   Court's assessment.  Given her compliance on the last period

22   since her noncompliance in this case, it would bode well.

23        THE COURT:  Okay.  All right.  Ms. Jacob, let me hear

24   first from you.  I do have some concerns with Ms. Kelley's, you

25   know, lack of full candor in her interview with the FBI.  I know

that you suggested that might be misconstrued by them, but, you know, there are a number of different ways that she seemed to attempt to minimize her conduct, one being a suggestion that the FBI deactivated her Facebook account.  That doesn't seem credible to me, nor does that she didn't enter first.

As I said, she did accept responsibility for at least the elements of the offense, and she seems to have admitted what she did.  And so I'm crediting that, but it is a little troubling that she wasn't fully forthcoming with them, and the evidence conflicts with the statements that the FBI said she gave to them.

MS. JACOB:  Yes, Your Honor.  So I will focus first on addressing the Court's concerns about that.

I actually inquired to the government whether or not there was an audio recording of that interview, because after talking to Ms. Kelley it just seemed like something was off about the context.  And thankfully, the government did provide that audio recording after I filed my sentencing memorandum.

And so now after listening to that audio recording, I do see the context, and I do think that Ms. Kelley, you know, since that interview, from the time of that interview until now, she's realized even -- she's realized kind of the gravity of what happened on that date even more.

But I do think that the summary, the written report the government relied on to say that she wasn't forthcoming or

1    minimized her conduct is taken a little out of context.

2              THE COURT:  Wait.  I don't want the public to hear

3    about the tape.

4              MS. JACOB:  Right.  And I will explain that, Your

5    Honor.  I just want to say that's me as her counsel saying that.

6    That's not Ms. Kelley saying it.  I just want to make that

7    clear, because the --

8         (Simultaneous speaking.)

9              THE COURT:  -- I want your best argument.

10             MS. JACOB:  So the context was that she never -- Your

11   Honor, she did discuss losing the group.  That was a lot of the

12   interview, that basically she lost them for several hours.  She

13   did not mean to -- or I should say, I did not mean to suggest in

14   my memorandum that she only found them, was only reunited at the

15   steps, you know, at the entrance of the Capitol building.  No,

16   she was reunited with them on the grounds, and they were -- what

17   Ms. Kelley explained to the FBI is that they were all, the group

18   was all amongst a large, large crowd moving towards the entrance

19   together.

20        And so when she -- she explained to the FBI that when she

21   was on -- when she, you know, was closer to the entrance, she

22   definitely wanted to -- she did want to reunite with them, but

23   that was not said in response to why did you go in the building.

24   So she never said to the FBI, oh, they were in the building

25   first, and that's why I followed.  No.  I mean, it was -- the

1    conversation didn't go like that.  Instead, she said --

2           THE COURT:  Okay.  What about the deactivating of the

3    Facebook account?  Does she admit that she did that?

4           MS. JACOB:  In the audio recording, no, Your Honor,

5    but that wasn't really -- it wasn't really discussed in detail.

6    And I don't have anything particularly helpful to offer the

7    Court except for the fact that, you know, regardless of whether

8    the FBI did it or she did it, that's one of her mitigating

9    points, is that she really was not -- you know, she distanced

10   herself from January 6 and the events.  She didn't send people

11   messages.  She didn't get on other platforms, social media

12   platforms and express some of the views that some of the other

13   Capitol defendants have been expressing.  I do think that's

14   actually a mitigating factor.

15          THE COURT:  Okay.  And I know she had a really rough

16   period of time with her own diagnosis and losing her dad and

17   being a single mom, and there were a lot of demands on her, I

18   think at one point even taking care of her own mom; is that

19   right?

20          MS. JACOB:  That's right, Your Honor.  And I think

21   that that's -- that's what all culminated to a certain point

22   during her pretrial release, and that all led to the drug use,

23   which she had never been a drug user.  I mean, that was a

24   completely isolated time period for her.  Losing her father, I

25   mean, her father was everything to her.  He took care of her and

her son, you know.  She relied on him.  He raised her primarily, along with her stepmother.  And so losing him a few years ago was absolutely devastating to her.  On top of that, Your Honor, she had a diagnosis of cancer and endometriosis.

Dealing with all of that while raising a son, while being a primary care-giver of her 11-year-old son while working what can be sometimes a very busy job put a lot of stress on Ms. Kelley. And I think that, you know, that's what led to her arrest in her prior offense and that's what led to her drug use.  It was very short lived, and she spent five days in jail for that, and she snapped out of her feelings of, you know -- she kind of lost sort of motivation to continue at some point.  She's overcome that, and she has -- what's unique about Ms. Kelley and why I think that a lengthier period of supervision is actually not necessary is that she's already gone through a strict condition. She did Narcotics Anonymous classes every day for -- I want to say it was a few months.  And she tested negative -- ever since September, she's been testing negative.

So she's done everything that's asked of her in that case, and she successfully completed supervision.  So she's already shown that she's overcome that period of her life and that she's stable.  And so I think that goes in her favor.  I don't think a lengthy period of supervision is necessary or a period of home detention.  I don't think she's shown that she is any further danger to the community, you know.  She's not a danger to the

community.  She's shown that she's distanced herself entirely
from her conduct.

Your Honor, she is remorseful for what happened.  The
government, you know -- I know that the government pointed out
concerns that she was sort of minimizing her conduct.  But, you
know, I didn't get that when I listened to the audio recording.
I think that she was explaining -- she was answering the
questions honestly, and she sat down with the FBI.  And I know
that it was after her plea agreement and so was a part of her
plea agreement, but if she had not been remorseful, she wouldn't
have done that.  And she answered all their questions.

And she wrote a sincere letter to the Court.  I disagree
with the government that it's a generic letter.  I think it took
her a long time to write, and I think it had a lot of sincere
words.  And, you know, she's going to address the Court today as
well.

I don't see -- I don't see the -- you know, the government
is trying to paint her as being not remorseful.  And besides,
you know, her interview, I just don't -- I just don't see how
from her interview until now she hasn't been remorseful.  She's
accepted responsibility.  She's pled guilty.  She's been
compliant with Pretrial.  She hasn't gone on social media to
express any different views.

And Your Honor, I just -- I think that the likelihood of
recidivism in this case is just extremely low, given what I've

1    just explained.

2              THE COURT:  Ms. Jacob, let me hear from you on the

3    conditions.  I'm inclined to agree with you on home detention.

4    I'm not inclined to agree with you on the length of probation.

5    I think it's in her interest to be on probation.  And as you

6    know, if she's complying with probation in the beginning, the

7    amount of contact she's going to need to have with them will be

8    reduced over time if she's performing well.

9         So my real concern with her is this, even if aberrant,

10   nonetheless worrisome period with the abuse of alcohol and

11   drugs, and there is some family history there.  So I would like

12   you to talk about the conditions that Probation is recommending

13   as conditions of release, namely the substance abuse treatment

14   and testing.

15        I take it you don't disagree with that?

16             MS. JACOB:  Your Honor, I don't disagree with that,

17   although, you know, I would note that I think that, you know,

18   she has already been through that.  But I think she would agree

19   with the Court that, of course, if the Court thinks that that's

20   appropriate, then she's more than willing to do so.

21        I guess I would just suggest that -- I think she's -- the

22   NA classes, I think, she's been attending by Zoom.  And so if

23   that can be the treatment rather than her having --

24             THE COURT:  I think that's something she works through

25   with Probation, but my understanding is that they're -- correct

1    me if I'm wrong, Probation, but that they want to make this

2    easy.

3        And tell me what she's envisioning in terms of employment.

4    How is she able to -- I know she has a part-time job now.  Is

5    that something that she's hoping to ramp up and become more

6    full-time?  What are her plans in that regard?

7        MS. JACOB:  Your Honor, the way that Ms. Kelley

8    described her job to me was that sometimes it can be part-time

9    and sometimes it can be really busy and be full-time.  It's just

10   as an insurance adjuster, I think it depends on what natural

11   disasters and calamities are occurring.  And so sometimes it's

12   slow, but sometimes it's really busy.  So I think that's just

13   entirely dependent on circumstances, but as far as I know, that

14   is her plan, to continue with her current employment.

15       THE COURT:  But given her negative monthly income, is

16   she living off of inheritance?  How is she staying afloat?

17       MS. JACOB:  Your Honor, she -- I guess the negative

18   monthly income, she had to kind of average it out, because some

19   months -- the months that are busy she'll make more, and the

20   months that are slow, you know, it will be a big hit to her

21   income.  And so --

22       THE COURT:  Even so, that's problematic over the long

23   run.  So what is her cushion, if any?  Does she have one?

24       MS. JACOB:  Your Honor, I don't know the answer to the

25   Court's question in that regard.  Perhaps I can turn to --

1   Ms. Kelley can address that in her statement to the Court, but

2   I'm not sure if she has an additional cushion.

3          THE COURT:  Because that's an obvious stressor with a

4   child and paying the bills.  It does give me concern that the

5   pressure she felt before that led to this conduct could still be

6   there if she can't pay her bills.

7          MS. JACOB:  Right.  I understand that, Your Honor.

8   And after -- I've had conversations with Ms. Kelley, and the way

9   that she explained it to me is that she's able to make it work.

10   Obviously, it's tight, but she's been able to make it work being

11   an insurance adjuster, and she really does rely on kind of those

12   busy months to make her overall yearly income work.

13          THE COURT:  Okay.  So I misspoke.  It's a negative

14   total net worth but not a negative monthly income.  Okay.  No,

15   it is a negative monthly cash flow.

16      All right.  Is there anything, Mr. Korba, just with respect

17   to Ms. Kelley you would like to add?

18          MR. KORBA:  No, Your Honor.  I think Your Honor has

19   covered it all.

20          THE COURT:  Okay.  All right.  Given that we focused

21   first on Ms. Kelley, Ms. Kelley, I didn't intend for you to

22   start first, but given that we've been talking about you, I

23   think if you would like to make a statement, now would be a good

24   time to do so.  You don't have to, but this is your opportunity

25   to address me before I impose sentence if you would like to do

1  so.

2       DEFENDANT KELLEY:  I do want to say that I am truly

3  sorry, and I have been carrying the weight on my shoulders this

4  past year on what has took place.  And I've felt so much guilt

5  this past year on what I did that I really have been putting

6  myself into a position to where there's not enough weight that

7  anybody else can put on my shoulders but myself, because I

8  really have felt so remorseful and so, you know, sorry for what

9  I've done that I can't express it enough.

10      So that's why I have distanced myself and I have cut myself

11  off from the outside world and media, because I don't want to be

12  a part of it.  I just -- I don't know.

13      THE COURT:  Ms. Kelley, you've been through a lot in

14  the last few years, and for those reasons, I'm inclined to

15  impose as a condition a mental health assessment and treatment

16  as needed.  Is that something you're receptive to?  It seems

17  like you're carrying a big burden, and there's financial

18  concerns, and all of that could be helpful.

19      DEFENDANT KELLEY:  I am receptive to it.  However, I

20  do have a 401(k) that I am able to fall back on financially.  So

21  I am able to take care of my son.  It has been a heavy burden,

22  but that's what's made me stronger.  And I am happy.  I am a

23  whole person.  And I am willing to take responsibility for what

24  I've done and carry that load.  And that's why I said that I am

25  truly remorseful, because I have carried that load from day 1

1    after I realized that what I had done was wrong.

2        I don't feel like I'm mentally incapable or that --

3        THE COURT:  I'm not suggesting that at all.  It's just

4    it's a lot when you have this many major life events come all at

5    once.

6        DEFENDANT KELLEY:  It is.

7        THE COURT:  Sometimes some support is useful just in

8    getting through a rocky period.

9        DEFENDANT KELLEY:  And I'm actually handling that on

10   my own.  With talking with family and talking with neutral

11   parties, I am actually addressing that on my own.

12       THE COURT:  Okay.  All right.  I appreciate your

13   remarks, and I do believe that you're genuinely remorseful.

14       I'm kind of inclined, so Ms. Kelley and Ms. Jacob, you

15   don't have to sit through the rest of the sentencing hearing, to

16   go ahead and sentence Ms. Kelley, and then move on to the Quicks

17   and Mr. Martin.

18       Any objection to doing that?  Mr. Korba?

19       MR. KORBA:  Not from the government, Your Honor.

20       THE COURT:  Ms. Jacob?

21       MS. JACOB:  No, Your Honor, no objection.

22       THE COURT:  Okay.  Ms. Kelley, I didn't mean to cut

23   you off.  Is there anything else you would like to say before I

24   sentence you?

25       DEFENDANT KELLEY:  No, Your Honor.

1          THE COURT:  Okay.  All right.  Well, I do want to say

2     that -- one moment.

3          I have, as I've noted already -- the 3553(a) factors apply

4     here; the guidelines do not.  And I have considered all those

5     factors even if I don't list them all here.  I'm familiar with

6     them, and I have considered them.

7          Looking first at the nature and circumstances of the

8     offense -- and what I'm about to say with regard to that applies

9     to all four defendants.  Although none of these defendants

10    engaged in any acts of violence or property damage on January 6

11    of 2021, they were a part of a large mob that disrupted the

12    peaceful transfer of power.  They knew they had no right to be

13    in the Capitol that day, and their mere presence, as I've noted,

14    did make it more difficult for those Capitol police officers and

15    other law enforcement officers to do their jobs defending the

16    Capitol and those inside the building.

17         I recognize there's no evidence that any of these

18    defendants went to D.C. or even to the Mall that day, on

19    January 6, with an intent on entering the Capitol, but even if

20    they didn't appreciate the significance of their actions on that

21    day, still, this is a serious offense that undermines the rule

22    of law.

23         And so looking first at the nature and circumstances of the

24    offense, it's a serious one, and as other judges have said,

25    probation is not to be expected in all of these cases for that

1    reason.

2         Looking at the next -- another factor that will apply to

3    all of these defendants, and that is, the need to avoid

4    unwarranted sentencing disparities, as I've said already to

5    Mr. Korba, I'm looking at this case in the context of all the

6    other sentences I've imposed in similar cases, and I've also, in

7    imposing this sentence and other sentences, looked at what other

8    judges on our court have done.

9         Though I recognize the government is asking for a sentence

10   of imprisonment and/or home detention, home confinement in this

11   case, I don't think that's necessary.  I think a sentence of

12   probation will best fulfill the goals of the Sentencing Reform

13   Act, and I do find this case more analogous to cases like

14   Schwemmer, Harrison, and Wangler than I do some of the other

15   cases like Dillon, who I sentenced to home detention, again for

16   all the reasons I've stated, the lack of aggravating factors in

17   this case.

18        So for that reason, with respect to all these defendants, I

19   am considering imposing a sentence of probation with conditions.

20        With respect to Ms. Kelley, I will not impose a fine,

21   because I don't think she has the ability to pay a fine.  I also

22   will not order community service, because I do think that she

23   has a lot on her plate right now, and I do want her to focus on

24   increasing her employment to address her financial burden.

25        And also, I will impose a more extensive period of

supervision of three years and substance abuse treatment and
testing, as well as I will order a mental health assessment.  I
understand Ms. Kelley thinks she doesn't need it, and that may
well be true, but I think it's prudent, given the way in which
she acted, you know, with kind of an aberrant episode of drug
and alcohol use, and given the family history, I think it's
important to see if there is a need for more support in that
regard, not because I think that she can't handle it on her own.
I just think she might need more tools to do so through these
stressful periods.  So I will impose that as well.

So let me go ahead and I will read the formal sentence, and
before I impose it, I will give both parties an opportunity to
object.

Pursuant to the Sentencing Reform Act of 1984 and in
consideration of the provisions of Title 18 United States Code
Section 3553, it is the judgment of the Court that you, Kari
Kelley, are sentenced to a term of 36 months, three years,
probation.  And I note this is consistent with the probation
officer's recommendation in this case.  And that is on Count 4.

In addition, you are ordered to pay a special assessment of
$10.

I will authorize supervision of this case to be transferred
to the U.S. District Court for the Southern District of Alabama,
but I will retain jurisdiction.

While on supervision, you will abide by the following

mandatory conditions, as well as the standard conditions of supervision which Probation will review with you after this sentencing.  The mandatory conditions include not committing another federal, state, or local crime, not unlawfully possessing a controlled substance, refraining from any unlawful use of a controlled substance, submitting to a drug test within 15 days of placement on supervision and at least two periodic drug tests thereafter as determined by Probation.  You also must make restitution -- that is a part of the plea agreement in this case -- of $500, and that's payable to the Clerk of Court for the U.S. District Court.  The victim is the Architect of the Capitol, and the amount is $500.

You must also provide the probation officer access to any requested financial information and authorize the release of that financial information and not incur new credit charges or open additional lines of credit without the approval of the probation officer.

Again, I will impose substance abuse treatment.  Probation will supervise your participation.  That is, treatment and testing, as well as a mental health assessment and treatment, if necessary.

I think I've said already I will not impose a fine.

I will advise you, Ms. Kelley, to the extent you have not already validly waived your right to appeal, you do have the right to appeal.  To do so, you must file any appeal within 14

1    days after the Court enters judgment, and if you're unable to

2    afford the cost of appeal, you may request permission from the

3    Court to file an appeal without cost to you.

4        Before I impose the sentence, let me ask counsel and also

5    Probation if there are any objections to the sentence that I've

6    said that I will impose.

7        Mr. Korba?

8            MR. KORBA:  Not from the government, Your Honor.

9            THE COURT:  Ms. Jacob?

10           MS. JACOB:  No objection, Your Honor.

11           THE COURT:  Okay.  Ms. Gavito?

12           PROBATION OFFICER:  No objections, Your Honor.

13           THE COURT:  Okay.  All right.  So that is the sentence

14   of the court.  I will impose that sentence.

15       And Ms. Kelley, I wish you the best.  I hope not to see

16   you, but I will ask for a periodic -- generally, I only see you

17   if there's a problem.  But I will ask for a periodic status

18   report, Ms. Gavito, in one year on how Ms. Kelley is performing

19   on probation, and if necessary, I will order a future one after

20   that.  But I want to hear that, Ms. Kelley, you've completed the

21   conditions and you're doing well.

22       And if there are issues, Ms. Kelley, if things are too

23   burdensome, reach out to your counsel, talk to Probation.

24   That's the most important thing.  And let's have a hearing, if

25   need be.  I can make modifications of conditions.  But I do want

1   to see a commitment from you that you are doing what you can to

2   help yourself.  All right?

3            DEFENDANT KELLEY:  Thank you, Your Honor.

4            THE COURT:  Okay.  Anything else, Ms. Gavito?

5            PROBATION OFFICER:  Your Honor, for clarification

6   purposes, was there a motion from the government to dismiss the

7   remaining counts as to Ms. Kelley?

8            MR. KORBA:  I'm sorry.  Yes.  The government would

9   move to dismiss the remaining counts other than Count 4.

10            THE COURT:  I will grant that motion.  Thank you.

11       All right.  So I will excuse Ms. Jacob and Ms. Kelley and

12   move on to Mr. Martin and the Quick brothers.

13            MS. JACOB:  Thank you, Your Honor.

14            THE COURT:  Sorry, folks.  I didn't intend to start

15   with defendant 4, but it just made sense to do that.

16       All right.  So Mr. Korba, let's go through Mr. Martin and

17   the Quick brothers.

18            MR. KORBA:  Yes, Your Honor.  I will start my

19   allocution with Mr. Martin.

20       I completely understand the Court's position on the

21   government's request for incarceration and also the Court's

22   rationale for leaning in the direction of probation without home

23   confinement.  I'm going to try to focus on a few factors that we

24   believe is relevant as to Mr. Martin, why the government would

25   still ask for at least a period of home detention.

1          Number 1, defendant Martin does appear to have the most

2    serious criminal history out of all four of the defendants.

3    While the government would acknowledge that some of the

4    convictions are dated, I do believe that one of the convictions

5    appears --

6          THE COURT:  Sorry.  Aren't they all more than ten

7    years old?

8          MR. KORBA:  Yes.  I was just going to point out that

9    it does appear that he was under supervision at least until 2015

10   on one case.  So that was within the last ten years of the

11   Capitol offense.  So that was the only thing I was going to

12   point out with regard to the criminal history.

13         THE COURT:  All right.

14         MR. KORBA:  Your Honor, with regard to the factors of

15   the case, I do believe some of the items that would stand

16   Mr. Martin apart from his other co-defendants is he did

17   seemingly delete a Facebook video in the days after the riot.

18   And I do -- from the government's perspective and, it seems,

19   from the defense memo, he did that in order to avoid detection.

20   It appears his reasons were out of fear about his presence at

21   the Capitol and out of fear that people were going to report

22   him.  So I do believe that's an aggravating factor with regard

23   to him attempting to avoid detection with regard to his presence

24   in the Capitol.

25         Your Honor, I would also submit that it appears Mr. Martin

did not demonstrate real genuine remorse with regard to his
interview at least to the FBI or law enforcement following the
plea agreement.  He appears to maintain an irrational belief,
from the government's perspective, that the only wrong thing he
did was enter through a window as opposed to enter through a
door, which of course is completely false because one does not
have to enter a broken window or break something in order to
commit a trespass-related offense or even a felony-related
offense.

       THE COURT:  Clearly not, Mr. Korba, but tell me where
you're getting that.  That was lost on me a little bit.  Is this
the 302?

       MR. KORBA:  I believe that is in the government's
sentencing memo.

       THE COURT:  But I didn't quite track.  This is based
on his interview with the FBI?

       MR. KORBA:  That is my understanding, Your Honor.  I'm
again relying on prior counsel.  But that is my understanding,
that it came from the interview with law enforcement.

       THE COURT:  Yeah.  And another thing -- I don't mean
to get ahead of ourselves, but with respect to, I think, one or
both Quick brothers, there's still this notion coming out
through Probation that they had -- it wasn't clear to them that
they couldn't enter because so many people were going in and
police were fist bumping some of the January 6 rioters, for lack

1    of a better word.  So if you can speak to that.  I don't know if

2    that's a part of Mr. Martin's mind-set as well.

3              MR. KORBA:  Absolutely, Your Honor.

4              THE COURT:  But they took a plea in this case, and

5    that does trouble me.

6              MR. KORBA:  I completely agree with Your Honor.  I

7    believe it is inconsistent with accepting responsibility to

8    somehow portray that day to believe that they were entitled to

9    be there or they weren't trespassing.  I think that just kind of

10   flies a little bit in the face of accepting true responsibility

11   for their actions.  So I would agree that that is another factor

12   that should weigh against them and against just a straight

13   probationary sentence without home detention.

14       Your Honor, obviously, even in their own statements, their

15   explanations belie the facts that they passed through broken

16   glass, police in riot gear.  There's absolutely no rational

17   person who would believe that they were entitled to be in the

18   Capitol that day, the government would submit.

19       Lastly, Your Honor, I know this is already pointed out in

20   the government's sentencing memorandum, but it does appear that

21   Mr. Martin has been missing a couple of his check-ins.  I think

22   the latest report actually had a missed check-in the week of

23   March 5th.

24              THE COURT:  A total of five.

25              MR. KORBA:  Right.  So the government is certainly

1    concerned about that.  It does appear to -- it does create some

2    concerns about his ability to take serious probation and comply

3    with all the terms of probation and appreciate the consequences

4    of his actions.

5        So for those reasons, the government does believe that a

6    period of home detention at the very least in addition to the

7    lengthy period of probation the government is asking for is

8    appropriate in Mr. Martin's case.

9          THE COURT:  All right.  Do you want to go ahead and

10    move on to the Quick brothers?

11          MR. KORBA:  Sure, Your Honor.  Absolutely.  Thank you.

12        So with regard to Michael Quick, who I will start with

13    first, Your Honor, I would just reiterate some of the same

14    arguments that the Court pointed out that I made regarding the

15    idea that he didn't know he was trespassing.  Again, I just

16    think that is completely contrary to, I believe, his interview,

17    which is cited in the government's memo on page 12.  Just prior

18    to those statements, he acknowledges that he passed by broken

19    glass and police in riot gear.  And entering through a window, I

20    just don't know how anyone in their reasonable mind would

21    believe that they were okay and lawfully allowed to be at the

22    U.S. Capitol at that point in time.

23        So again, I do see that, the government sees that as a

24    complete minimization of their actions -- his actions and not

25    taking full responsibility.

1      I would just note, Your Honor, that again they claim they

2   didn't see any violence or any destruction, but as his brother

3   points out, Mr. Stephen Quick, he admits that they engaged in

4   the "fight for Trump" chants by the crowd.  So I don't really

5   find that explanation plausible either.

6      And again, with regard to Mr. Quick, he is another one of

7   the defendants that the government does not believe is really

8   indicating true remorse.  It appears, based upon some of his

9   statements, I believe, in his interview, that he only appears to

10  be sorry that he lost faith with the press after he posted

11  positive things about his experience while participating in the

12  Capitol riot.

13     So for that reason, the government would submit that a

14  period of home detention is appropriate as well as a lengthy

15  period of probation in Mr. Michael Quick's case.

16          THE COURT:  Okay.  Anything else, Mr. Korba?

17          MR. KORBA:  Not with regard to Mr. Michael Quick.

18  Just lastly, I can speak to Mr. Stephen Quick.

19          THE COURT:  Yes, please.

20          MR. KORBA:  The government personally does see

21  Mr. Stephen Quick in a little bit of a different situation with

22  regard to at least his statements to law enforcement and his

23  expression of remorse.  It does appear that he fully

24  acknowledges that he knew bad things were on the horizon and

25  that things were going left and things were feeling strange.  It

didn't feel right, I believe, were his own words.

In some respect, that cuts against him because he still went in the Capitol after realizing all these things. But at least Mr. Stephen Quick was truthful enough and had the candor to acknowledge that he knew something was afoot, something bad was afoot, and that he was not entitled to be in the building. He doesn't make any comments to suggest that he believes he was entitled to be in the building that day.

Mr. Stephen Quick did -- does stand apart, I believe, again from his co-defendants in that he immediately in his law enforcement interview expressed disappointment in himself and acknowledged that he was really engaging in mob-like mentality, which I believe that he -- by expressing that view was remorseful about. So he does not, like his co-defendants, appear to make light of his behavior.

I note his criminal history is also completely devoid of any criminal convictions whatsoever, and he does appear to be in consistent compliance with Pretrial.

So from the government's perspective, he should receive, out of all four of the defendants, some credit for that, perhaps the most lenient sentence out of all four. However, the government would still ask for a lengthy period of probation.

THE COURT: All right. Thank you, Mr. Korba.

Mr. Passanise, I do want to credit all three defendants for accepting responsibility, at least the elements of the offense,

1    at the time of the plea, but I am concerned with the tension

2    between that and the comments of at least two to Probation.  So

3    I would like you to address that.  I also am crediting their

4    willingness to be interviewed by the House Select Committee.

5         I just -- obviously, they all showed an incredible lack of

6    judgment on January 6, but help me understand why I should look

7    at this as an in-the-moment lapse of judgment rather than

8    something that needs more, you know, punishment or deterrence in

9    terms of the future.  I'm not contemplating a year probation for

10   any of them.  I'm looking at two to three with conditions, so

11   just to kind of preview where I am.

12        Tell me why I should go to the lighter rather than the

13   heavier end and your position on home detention.

14             MR. PASSANISE:  Yes, Your Honor.  My comments

15   collectively with these three, because they were all together

16   that day, first of all, to address the government's concern and

17   the Court's concern about genuine remorse, in particular, the

18   Quick brothers, they were interviewed prior to counsel, prior to

19   being charged, like within days of January the 6th.  And not

20   that it's an excuse or a mitigator.  I don't think the gravity

21   of their inappropriate behavior had fully set in at that time.

22        As the Court already has indicated, they had no preplanned

23   intent to go into the Capitol.  They got sucked into the

24   craziness, so to speak, of the atmosphere.  Their behavior was

25   inappropriate.  There is no excuse.  They have accepted

1    responsibility.  They fully cooperated with the FBI, gave access

2    to their social media.  The government has done, as you've seen

3    in filing their suggestions, gone to great lengths as to

4    identifying the worst of the worst here for all three

5    individuals what they did as far as social media.

6        The context of the interviews with the Quicks as well as

7    with the Martins was full candor, full honesty, answering the

8    questions.  And even in regards to Mr. Martin, same thing.

9        THE COURT:  Sorry to interrupt.  But Mr. Passanise,

10   what about the remarks to Probation which came post-plea?  It

11   did make me concerned about whether they should have pled.  I

12   thought that a couple of them said they didn't think they were

13   doing anything wrong to be inside the Capitol.  Am I remembering

14   that incorrectly?  It's the post-plea remarks to Probation that

15   concern me.

16       MR. PASSANISE:  Your Honor, I was on each of the calls

17   with Probation, and to my knowledge, they didn't make any other

18   statements.  But --

19       THE COURT:  This is Probation summarizing the law

20   enforcement comments?  Ms. Gavito, can you speak to that?

21       PROBATION OFFICER:  I'm looking to see who said that,

22   Your Honor, with regard to the three defendants.  I'm looking

23   for that in the presentence report as to both Mr. Quicks --

24       THE COURT:  It appears Michael Quick, paragraph 21.

25   Oh, I see.  So this is quoting the complaint, which

1    presumably --

2            MR. PASSANISE:  Yes, Your Honor.

3            THE COURT:  Okay.  I'm sorry.  I thought this was in

4    an interview with Probation.  But was there not also a separate

5    interview?  No, you just agreed to the conduct described in the

6    Statement of Offense.  So I was reading those statements as

7    their interview with Probation.  So these are pre-plea

8    statements.

9            MR. PASSANISE:  Correct, Your Honor, in the 302.  And

10   the timing of both the Quicks as well as Martin's 302s was -- if

11   you remember, it was a part of the plea agreement that those

12   interviews and access to social media were taken place prior to

13   the Court's acceptance of the plea.

14       Obviously, the one concern is, and I agree with the

15   government in indicating that Mr. Martin deleted his social

16   media.  I think it was just shame and remorse.  I understand the

17   appearance of it, but when he was interviewed by the FBI, he

18   gave the government access to his phone and his social media.

19   And I also believe the government had access to the Facebook to

20   see if there was any inappropriate posts or angry posts or

21   anything.  And to my knowledge, that was not there.

22       As you've already indicated, all three of them not only

23   cooperated with the FBI on the social media, they accepted

24   responsibility, and then all three sat for questioning with the

25   House legislative committee to further cooperate and give

1    insight for their report.

2        So I do take issue a little bit with the government's

3    characterization that it wasn't true remorse by all three.  This

4    has been a situation where all three have been embarrassed here

5    in our community.  They've been humbled by this process.

6    They've lost family and friends because of their behavior and

7    their actions that day on January the 6th.

8        This was -- all three of them -- if you're interested, all

9    three of them wished had they thought back -- as the Court has

10   alluded, this was such a short window, about 12 to 15 minutes.

11   And there was no confrontation, no disrespect, no property

12   destruction, no violence.  They voluntarily left, and they've

13   tried to right the wrong since day 1.

14       So I don't know if you want me to address anything else

15   specifically, Your Honor.  I know you know a lot more, as you've

16   done many sentencings on these.

17           THE COURT:  Well, no, I appreciate your comments, and

18   I've reviewed the presentence reports carefully and appreciate a

19   lot of what you're saying here in terms of impact of this on

20   their personal lives and their hard work and their jobs, and

21   their -- to the extent they have any criminal record, they are

22   fairly dated.

23       With respect to Mr. Martin and also Mr. Michael Quick, I

24   do, in light of paragraph 53 and 63 of Mr. Martin's PSR, like

25   with Ms. Kelley, I'm inclined to require a mental health

1    assessment.  And I'm not suggesting that any have major mental

2    health issues, but I think they've all had struggles that could

3    benefit from at least an assessment.  The same for Michael Quick

4    in light of paragraphs 58 through 59.  So I will include those

5    conditions on theirs.

6        But I do credit their cooperation with law enforcement and

7    the House Select Committee and do think even though their

8    remorse was a little slow in coming, perhaps, it does seem

9    genuine to the Court.  So I am crediting that.

10       But let me give Mister -- let me start with Mr. Martin,

11   unless there's anything you want to add, Mr. Korba, to what

12   Mr. Passanise said.  I'm going to hear from each defendant to

13   the extent they want to address the Court.  Is there anything

14   else you would like to add?

15               MR. KORBA:  No, Your Honor.

16               THE COURT:  All right.  So I will start with you,

17   Mr. Martin.  As you've heard me say to Ms. Kelley, this is your

18   opportunity to address the Court.  You don't have to, but if

19   there's anything you would like to say to me before I impose

20   sentence, I welcome it.

21               DEFENDANT MARTIN:  Okay.  Thank you, Your Honor.

22       I just -- it's just been -- it's just been really hard, and

23   I can't believe that I made the decision to do what I did that

24   day.  I just want you to know that I am truly sorry.  It is just

25   totally embarrassing to be here right now.  I just -- I just

1    appreciate your compassion and, you know, just -- I mean, I

2    don't know what else to say.  Thank you.

3            THE COURT:  Mr. Martin, I just have a question.  I

4    know a lot of the January 6 defendants in that moment, I

5    think -- I think that your sentencing materials, I think you

6    were one of those who felt like there were irregularities in the

7    election and there should be delay, it was either you and/or the

8    Quicks, and you were -- you felt you were there to show support

9    on what you viewed as a wrong, and at the moment, in that

10   moment, so many January 6 rioters, for lack of a better word,

11   felt that what they were doing was fully justified.

12           Looking at this now where you sit, do you see how erroneous

13   that view was?

14           DEFENDANT MARTIN:  Yes, I do; yes, Your Honor, I

15   definitely do.

16           THE COURT:  All right.  Because it did take a little

17   while.  I mean, I think even in those post -- those initial

18   statements to law enforcement are not quite what I would like to

19   see in terms of appreciating the severity of the conduct.

20           Can you help me understand what was going through your mind

21   at that point?

22           DEFENDANT MARTIN:  It was like a perfect example of

23   curiosity killed the cat.  I was just -- I didn't know -- it was

24   just wild and crazy, and I just wasn't thinking straight, you

25   know, when that happened.

```
1              MR. PASSANISE:  You've had a chance to reflect.

2              DEFENDANT MARTIN:  I've had a chance to reflect on it,

3     and I'm just super remorseful.  I wish I had never gone to the

4     Capitol.  I wish we would have left immediately.

5              THE COURT:  Okay.  All right.  Let me move on to

6     Michael Quick, if he would like to make a statement.

7              DEFENDANT M. QUICK:  Yes, Your Honor.

8         As far as remorse, yes, I think we've all experienced a

9     great deal of remorse.  My statements to the FBI, they were in

10    context of at the time.  It was not how I was feeling

11    afterwards.  It was after we had gone that we realized the

12    gravity of the situation.  We've all been through a lot.

13        That's really all I can say about that.  Deeply

14    regrettable.  No intentions to go to the Capitol, and if that's

15    a moment we could take back, we would not have went.

16             THE COURT:  All right.  Stephen Quick, would you like

17    to make a statement?

18             DEFENDANT S. QUICK:  Yes.  I'm just really embarrassed

19    with our actions.  It was totally out of character for us,

20    and --

21             MR. PASSANISE:  Sorry.

22             DEFENDANT S. QUICK:  -- I am sorry.  That's about all

23    I can say.  Thank you.

24             THE COURT:  All right.  Anything more from you,

25    Mr. Korba?
```

1          MR. KORBA:  No, Your Honor.

2          THE COURT:  As I said previously, I won't review the

3    nature and circumstances of this offense, which I view is very

4    serious as I explained in sentencing Ms. Kelley for the same

5    acts.

6          Given that these defendants did not plan to go inside the

7    Capitol that day ahead of time, it seemed to be a spur of the

8    moment decision that showed incredibly poor judgment.  They did

9    follow Ms. Kelley into the Capitol.  I think the evidence shows

10   that.  They didn't commit any property damage or any assaults,

11   had no exchanges with law enforcement officers, didn't enter any

12   private areas, did cooperate with law enforcement on at least

13   two occasions, shared evidence with the FBI, cooperated with the

14   House investigative committee.  All of that reflects favorably

15   on them.

16       I don't view the deactivation of the social media account

17   in the same way as I view evidence destruction.  I think a lot

18   of people who posted things that they later regretted took that

19   down, and I don't know that that's destroying evidence in the

20   same way that some other Capitol defendants did destroy

21   literally photographs and physical evidence.  So I view this as

22   different.

23       They were inside a short period of time.  It was,

24   obviously, a reckless decision.  Based on Mr. Martin's prior

25   record, which though dated is more extensive, and his

deactivation of the Facebook account, based on those facts, I am going to impose a longer term of probation in his case of three years.  I'm also going to impose for both Quick brothers a period of two years' probation.

I will impose for Mr. Martin and Mr. Michael Quick a mental health assessment and treatment as needed.  And I think all can afford to pay a fine.  So I will impose a $1,000 fine in addition to the restitution that's ordered.  And I will also impose community service, to complete 60 hours in a year.

So I will read the sentence with respect to all three and give counsel an opportunity to object and Probation as well before I impose sentence.

So pursuant to the Sentencing Reform Act of 1984 and in consideration of the provisions of Title 18 United States Code Section 3553, it is the judgment of the Court that you, Zachary Hayes Martin, also known as Zach Martin, are hereby sentenced to a term of 36 months, three years, of probation on Count 4.  And with respect to Michael Quick, you are sentenced to a term of 24 months, or two years, of probation on Count 4.  And with respect to Stephen Quick, you are sentenced to a term of 24 months, two years, of probation on Count 4.

In addition, all three are ordered to pay a special assessment of $10.

The Court will authorize supervision to be transferred to the U.S. District Court for the Western District of Missouri,

1    but the Court will retain jurisdiction over this matter and will

2    order that a status report be filed with respect to all three

3    defendants within one year.

4        While on supervised release, you shall abide by the

5    following mandatory conditions, as well as the standard

6    conditions of supervision which Probation will explain to you.

7    The mandatory conditions include not committing another federal,

8    state, or local crime, not unlawfully possessing a controlled

9    substance, not possessing a firearm, refraining from any

10   unlawful use of a controlled substance, submitting to a drug

11   test within 15 days of placement on supervision, and at least

12   two periodic drug tests thereafter as determined by Probation.

13       You're also ordered to make restitution consistent with the

14   plea agreement in the amount of $500, and that is to the Clerk

15   of Court, made payable to the Architect of the Capitol.

16       You must provide the probation officer with access to any

17   requested financial information and authorize the release of any

18   financial information.  The Probation Office may share that with

19   the U.S. Attorney's Office.

20       I'm also imposing a fine in the amount of $1,000 with

21   respect to each defendant.

22       And I'm imposing a condition of community service, again 60

23   hours, to be completed within one year.

24       And with respect to Mr. Martin and Mr. Michael Quick, I am

25   ordering a mental health assessment and treatment as needed.

1          And to the extent that you have not validly waived your

2     right to appeal through the plea agreement, you do have the

3     right to appeal, and if you choose to appeal, you must file any

4     appeal within 14 days after the Court enters judgment.  And if

5     you're unable to afford the cost of appeal, you may request

6     permission from the Court to file an appeal with no cost to you.

7          Before I impose this sentence, Mr. Korba, do you have any

8     objections?

9               MR. KORBA:  No objections, Your Honor.  We just move

10    to dismiss the remaining counts.

11              THE COURT:  Okay.  And I will grant that motion to

12    dismiss the remaining counts.

13         Mr. Passanise, do you have any objections to the sentence

14    imposed?  I'm sorry.  I couldn't hear that.

15              MR. PASSANISE:  None, Your Honor.

16              THE COURT:  And Ms. Gavito, any problems with the

17    sentences imposed?

18              PROBATION OFFICER:  No problems, Your Honor.  The

19    Court has ordered the transfer of supervision to the Western

20    District of Missouri as to all defendants in this case -- as to

21    these three defendants in the case, and the Western District had

22    a request, if the Court will consider a special condition that

23    each defendant shall submit his or her person and any property,

24    house, residence, office, vehicle, papers, computer, other

25    electronic communication or data storage devices or media and

1    effects to a search conducted by a U.S. Probation officer at a

2    reasonable time and in a reasonable manner based upon reasonable

3    suspicion of contraband or evidence of a violation of a

4    condition of release.  Failure to submit to a search may be

5    grounds for revocation.  The defendants shall warn any other

6    resident that the premises may be subject to searches pursuant

7    to this condition.

8        They asked for this condition --

9        THE COURT:  I saw that condition suggested with regard

10   to, I believe, Michael Quick, maybe Stephen Quick as well, but

11   it wasn't with Mr. Martin.  I'm interested in the government's

12   position on this.

13       My inclination is not to impose that condition.  It's not

14   one we typically impose in this court.  And obviously, if

15   there's a lack of compliance or concerns about any of these

16   defendants, I could always consider modifying conditions in the

17   future.

18       But what is the government's position on that?

19       MR. KORBA:  I agree with the Court.  I'm not familiar

20   with that condition being regularly imposed.  If Probation feels

21   it's necessary, they can ask for an amendment.

22       THE COURT:  Ms. Gavito, given this isn't a standard

23   condition in our court, I'm not inclined to impose that.  Is

24   that something that you think is required in order for them to

25   accept supervision?

1          PROBATION OFFICER:  We have been in communication with

2     the supervisor in the Western District of Missouri, and they

3     have expressed that in order for them to take -- to take

4     supervision as to these three defendants, they will require that

5     condition.

6          THE COURT:  Why is that not included in all of these

7     defendants' sentencing recommendations by Probation?  The Martin

8     one did not have that in there.

9          PROBATION OFFICER:  Your Honor, Mr. Martin's

10    recommendation, I prepared the recommendation as to that, and I

11    had not -- I had already disclosed the recommendation prior to

12    receiving notification from the Western District of Missouri.

13         THE COURT:  If I refuse to impose this and they don't

14    accept supervision, then what happens?

15         PROBATION OFFICER:  I'm not sure what will happen,

16    Your Honor.  I'll come back and --

17         THE COURT:  I'm not going to impose it.  Again, I will

18    reconsider, if necessary, but I don't feel that given that our

19    district does not typically do that and given the facts and

20    circumstances of this case and these defendants, I don't think

21    it's necessary, but I will revisit it if necessary.

22         Mr. Passanise, do you have a view?  Would you rather the

23    Court just simply impose it now to ensure that they can be

24    supervised in the Western District of Missouri?  Is it your

25    desire that that condition be in here so that we're not,

1    perhaps, back in another hearing to address this issue?

2              MR. PASSANISE:  I want to agree with the government,

3    Your Honor.  They spoke very eloquently on this condition.  I

4    don't know that it's going to be a problem.  I have not seen

5    some of this language that they want in this case in other

6    cases.  I realize that it's standard language, but I don't think

7    it's going to prevent them from supervision.

8              THE COURT:  Yeah, okay.  I'm inclined to hold the line

9    here, Ms. Gavito.  I can envision a case where that would be

10   appropriate.  I just don't see this as one such case and that

11   the degree of supervision that's required would need that.

12        But again, if Probation feels strongly about this and wants

13   to request that the Court modify the conditions, I will consider

14   that.

15             PROBATION OFFICER:  Thank you, Your Honor.

16             THE COURT:  So anything else aside from that issue?

17   Nothing more, Ms. Gavito?

18             PROBATION OFFICER:  No, Your Honor.

19             COURTROOM DEPUTY:  Your Honor, I just want to make

20   sure of one thing.  The mental health assessment only applies to

21   Mr. Zachary Martin and Mr. Michael Quick; is that correct?

22             THE COURT:  That's correct, and it's the assessment

23   and treatment as necessary.

24             COURTROOM DEPUTY:  Thank you, Your Honor.

25             THE COURT:  All right.  So that is the sentence I will

1    impose.

2         Like I said with Ms. Kelley, folks, I hope not to see you

3    all.  I wish you the best.

4         And Ms. Gavito, you let me know if there's a need to

5    revisit this.

6              PROBATION OFFICER:  Yes, Your Honor.  Thank you.

7              THE COURT:  All right.  Thank you all.  Thank you,

8    Mr. Korba, for standing in.  We appreciate it.

9              MR. KORBA:  Absolutely, Your Honor.  Any time.

10             MR. PASSANISE:  Judge, please give my best to Judge

11   Leon if you see him.

12             THE COURT:  All right.  Will do.

13             MR. PASSANISE:  Thank you.

14        (Proceedings adjourned at 12:31 p.m.)

15

16

17

18

19

20

21

22

23

24

25

```
 1                CERTIFICATE OF OFFICIAL COURT REPORTER

 2

 3         I, Sara A. Wick, certify that the foregoing is a

 4    correct transcript from the record of proceedings in the

 5    above-entitled matter.

 6

 7         Please Note:  This hearing occurred during the

 8    COVID-19 pandemic and is, therefore, subject to the

 9    technological limitations of court reporting remotely.

10

11

12    /s/ Sara A. Wick                    June 1, 2022

13    SIGNATURE OF COURT REPORTER         DATE

14

15

16

17

18

19

20

21

22

23

24

25
```